## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLINE ROY | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 13-2846 |
| SOAR CORP. | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                                    August   25, 2014

Pending before the Court is Defendant SOAR Corp. ("SOAR" or "Defendant")'s Motion

for Summary Judgment and Plaintiff's Motion to Strike Defendant's Objections to Discovery.

For the following reasons, Defendant's Motion is granted in part and denied in part, and

Plaintiff's Motion is denied.

## I.      FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiff Caroline Roy ("Plaintiff") is an individual residing in Philadelphia,

Pennsylvania.  (Compl. ¶ 1.)  Defendant SOAR is a business entity with its principal place of

business in Philadelphia, Pennsylvania.  (Compl. ¶ 2.)

### A.      Defendant's Business

Defendant is an outpatient substance abuse treatment clinic offering various services,

including counseling.  (Def.'s Mot. Summ. J., Ex. A, Deposition of Plaintiff ("Plaintiff Dep."),

Jan. 9, 2014, 41:19–42:14.)  From 2008 through 2012, Defendant responded to three Requests

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs.  To the extent the parties allege a fact that is unsupported by evidence, the Court does not include it in the recitation of facts.

for Proposals ("RFPs") issued by the non-profit corporation Community Behavioral Health ("CBH").  (Pl.'s Resp. Opp'n Mot. Summ. J., Exs. F, H, J, Def.'s CBH Proposals of 2008, 2010, and 2012.)  On October 6, 2008, in a proposal responding to CBH's RFP to offer medication-assisted treatment in Southwest Philadelphia, Defendant emphasized that it "strive[d] to meet the needs of our primary target population (largely African-American) at all points of service" and stated that "it is the intention of SOAR . . . to hire and staff the [Medication Assisted Treatment Program] with representatives of the cultural mix that can be found in the SW area of Phila[delphia]."  (Def.'s CBH Proposal of 2008.)  In another CBH proposal dated August 3, 2010, Defendant certified that it "intend[ed] to work with M[inority]/W[omen]/D[isabled] Business Enterprises with the goal of reaching 25% of the dollars subcontracted to for-profit M/W/DSBE subcontractors within 12 months of contract award."  (Def.'s CBH Proposal of 2010.)  This proposal won Defendant a provisional contract with CBH.  (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. I, CBH Award Letter.)

### B.     Plaintiff's Employment and Adoption Leave

Defendant hired Plaintiff on March 2, 2009 as a drug and alcohol abuse counselor.  (Id. at 42:20–25; Compl. ¶ 6.)  As a counselor, Plaintiff maintained a caseload of approximately thirty-five patients.  (Plaintiff Dep. 42:20–25.)  On November 28, 2010, following Plaintiff's completion of supervisor training as required by state regulations, Defendant named Plaintiff as a "clinical supervisor."  (Id. at 57:19–58:17; Pl.'s Resp. Opp'n Mot. Summ. J., Ex. A, Plaintiff Status Change.)  As a clinical supervisor, Plaintiff was responsible for supervising at least four other counselors, assigning new patients to counselors, conducting staff meetings, interacting with clients, and managing patient grievances.  (Plaintiff Dep. 59:18–60:23.)  In naming Plaintiff a "clinical supervisor," Plaintiff went from being paid an hourly wage to earning an annual

2

salary of $50,000.  (Id. at 54:21–56:15; Plaintiff Status Change.)  Between November 2010 and February 2011, Plaintiff carried a decreased caseload from her time as a counselor.  (Plaintiff Dep. 60:7–9.)  In February 2011, Plaintiff became the sole clinical supervisor at SOAR.  (Id. at 63:5–13.)  At that point, she stopped carrying a caseload altogether.  (Id.)

In May 2011, Plaintiff notified Mark Besden, regional director for Defendant, that she would be taking two months' leave in July 2011 to finalize the adoption of a child.  (Plaintiff Dep. 69:2–70:12.)  Besden voiced no objection to Plaintiff taking her leave.  (Id.)  That same month, Besden asked Plaintiff if she was interested in an open executive director position and whether she thought she could  "manage the responsibilities" of that position.  (Plaintiff Dep. 92:15–93:22).  Plaintiff responded that she was interested in the position and that she was capable of managing the responsibilities of being an executive director.  (Id.)  Defendant ultimately chose Robert Stringer ("Stringer"), a Caucasian man, to fill the open executive director position.  Plaintiff is a Caucasian woman.  (Compl. ¶ 1.)

Before Plaintiff took her adoption leave, she recommended two Caucasian, female colleagues— Ann Riordan and Ruth Zangerle—to take over her duties as interim clinical supervisor.  (Plaintiff Dep. 80:15–81:9; Pl.'s Resp. Opp'n Mot. Summ. J., Ex. K, Organizational Chart.)  Stringer opted instead to name Jonathan Marino ("Marino"), a Caucasian man, as interim clinical supervisor.  (Id.)  In July 2011, Plaintiff took her adoption leave.  (Plaintiff Dep. 68:10–12.)

### C.     Defendant's CARF Audit

Sometime during Plaintiff's absence, the Commission on Accreditation of Rehabilitation Facilities ("CARF") conducted a three-day audit of Defendant as part of its licensing process.  (Def.'s Mot. Summ. J., Ex. H, Deposition of Mark Besden, Jan. 31, 2014 ("Besden Dep.")

197:18–198:11.)  As part of the audit, Defendant had to produce approximately 160 pages' worth of Plaintiff's weekly supervision notes on eight counselors for CARF.  (Id. at 198:18–199:10; 201:3–11.)  In Plaintiff's absence, neither Besden nor any of his subordinates could locate any of Plaintiff's supervision notes.  (Id.)  Over the course of the three-day audit, Besden e-mailed Plaintiff three-to-four times "begging her to tell me, please, where [were] the supervision notes." (Id. at 198:19–199:1.)  Besden never received an e-mail response from Plaintiff.  (Id.)

Under the belief that CARF would not continue to license Defendant if he could not locate Plaintiff's records, Besden opened Plaintiff's filing cabinet with a crowbar.  (Id. at 196:8–23.)  Besden did not find Plaintiff's supervision notes in her filing cabinet.  (Id. at 199:9–10.)  Eventually CARF agreed to grant Defendant a provisional license because Besden was able to produce supervision notes from 2009 and 2010, predating Plaintiff's tenure as a clinical supervisor.  (Besden Dep. 197:6–198:7; Plaintiff Dep. 57:19–58:17.)  Neither Besden, nor Plaintiff, nor any other employee of Defendant ever located the missing supervision notes. (Besden Dep. 199:9–200:22.)

> **D.  Plaintiff's Return from Adoption Leave and Termination**

Plaintiff returned from her adoption leave in October 2011.  (Plaintiff Dep. 68:10–12.) At that time, Stringer decided that, going forward, Marino would continue performing the duties of a clinical supervisor going forward and would supervise ten counselors.  (Def.'s Mot. Summ. J., Ex. I, Deposition of Robert Stringer, Feb. 6, 2014 ("Stringer Dep."), 303:1–14.)  Plaintiff would supervise two counselors and once again carry a caseload of patients.  (Id.; Plaintiff Dep. 103:18–104:4.)  Plaintiff and Marino would share other supervisory duties.  (Plaintiff Dep. 102:9–18.)  Representatives of Defendant later testified that Plaintiff received disproportionately fewer counselors to supervise upon her return because Defendant needed Plaintiff to take on a

limited caseload of patients, because state regulations put a limit on the number of counselors a clinical supervisor may supervise and still carry a caseload, and because Defendant could never locate Plaintiff's supervision notes.  (Stringer Dep. 303:1–14; Besden Dep. 373:15–375:1.) Plaintiff later testified that Stringer told her that while she "could take the minutes of the meeting[s] because [she] got good at it[,]" he had decided to  keep Marino as the primary clinical supervisor "because he's a man[.]"  (Plaintiff Dep. 102:19–103:20.)

On October 18, 2011, Defendant converted all employees ranking below executive director Stringer from salaried employees to hourly employees, including Marino and Plaintiff. (Plaintiff Dep. 132:22–135:6; Stringer Dep. 83:19–84:3.)  Plaintiff was made aware of the change in a memo issued October 20, 2011.  (Id.; Stringer Dep. 304:23–24.)

On one occasion after her return from leave, Plaintiff called out of work by speaking with a receptionist.  (Plaintiff Dep. 149:14–150:7.)  When Plaintiff came back to work after her absence, she received an e-mail from Stringer warning her that she had failed to comply with Defendant's procedures for calling out by not speaking directly with her director.  (Id.)  On November 18, 2011, Plaintiff left work early without communicating with her director. (Plaintiff Dep. 182:11–185:20.)  On November 21, 2011, Plaintiff received a letter from Stringer warning Plaintiff that she had again failed to comply with proper procedures for being out of the office.  (Id.)  On November 30, 2011, Mary Douglas Bailey ("Bailey"), an assistant clinical supervisor, filed a complaint with Besden and Stringer stating that she had concerns about Plaintiff's "lack of assistance" in the preparation of certain "charts."  (Plaintiff Dep. 185:18–188:3.)

On December 2, 2011, Stringer convened a meeting with Marino, Bailey, and Plaintiff to discuss Bailey's complaint and Plaintiff's "leaving the premises without letting anyone know

where she was." (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. O , Stringer Memo on Plaintiff's

Termination.) After the meeting deteriorated into "a blame game," Stringer asked Plaintiff if she

still wanted to work for Defendant. (Id.) After Stringer "did not get an answer," he terminated

Plaintiff.[2] (Id.)

> ### E.    Demographic Changes Among Defendant's Employees

Following Plaintiff's termination, Defendant responded to another CBH RFP on April

10, 2012. (Def.'s CBH Proposal of 2012.) In that proposal, Defendant stressed to CBH that it

had "become aware of broader needs within the surrounding communities," and that "[i]n

addition to a large Italian population, [Defendant] also provides recovery oriented outpatient

treatment and support services to a growing Black, Latino, and LGBT community." (Id.) To

further highlight its commitment to serving a diverse population, Defendant included with its

proposal an organizational chart stating the race of each of its employees. (Organizational

Chart.)

Overall, in 2011, Defendant hired eighteen new counselors and supervisors, ten of whom

were Caucasian, and eight of whom were not Caucasian. (Def.'s Resps. to Pl.'s Interrogs.) Of

Defendant's eighteen hires in 2011, ten were women and eight were men. (Id.) Defendant

terminated seven employees in 2011: three Caucasian women, two Caucasian men, one African-

American woman, and one African-American man. (Id.)

---

[2] Following Plaintiff's termination, Stringer and Besden chose Bailey to assume Plaintiff's duties
as a clinical supervisor. (Stringer Dep. 127:15–128:6.) Defendant ultimately terminated Bailey
on January 11, 2013 for her prolonged arguments with co-workers and for failing to properly
complete "charts." (Id. at 132:12–134:7; Def.'s Mot. Summ. J., Ex. M, Def.'s Resps. to Pl.'s
Interrogs.) These were the same "charts" that were the subject of Bailey's complaints about
Plaintiff. (Id.) Bailey is an African-American woman. (Def.'s Resps. to Pl.'s Interrogs.)

**F. Procedural History**

Plaintiff initiated the present litigation on May 22, 2013, setting forth two causes of action against Defendants: (1) race and/or gender discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000 et seq. ("Title VII"), 42 U.S.C. § 1981a et seq.; and (2) violation of the Pennsylvania Human Relations Act ("PHRA"), Pa. C.S. § 951 et seq.  Defendant filed a Motion for Summary Judgment on May 6, 2014.  Plaintiff filed her Response on May 21, 2014.  Defendant filed its Reply on June 3, 2014.  The motion is now ripe for review.

**II.     STANDARD OF REVIEW**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence

7

presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

## III.   DISCUSSION

Defendants move for summary judgment on Plaintiff's Title VII and PHRA claims on the ground that Plaintiff has not made a prima facie case of race or gender discrimination and has otherwise failed to show that Defendant's legitimate, nondiscriminatory reasons for terminating Plaintiff are a pretext for reverse race and/or gender discrimination. Plaintiff responds that her claims can survive summary judgment because of 1) Defendant's overall stated intent to achieve racial diversity among its employees and 2) Besden and Stringer's comments about her position within the organization, relative to co-workers of a different race and gender. Under these facts, Plaintiff argues that she can show Defendant's stated reasons for terminating her are, at least in part, a pretext for race and/or gender discrimination. After carefully reviewing the parties'

arguments and the evidentiary record in this case, the Court cannot find that Plaintiff has met her burden to show race discrimination as to any of her claims, nor can Plaintiff show gender discrimination as to her termination.  As such, Defendants are entitled to summary judgment on these claims under Title VII and the PHRA.  There are, however, disputes of material fact as to Plaintiff's remaining claims of gender discrimination.  Therefore the Court will deny Defendant's motion for summary judgment as to Plaintiff's remaining gender discrimination claims under Title VII and the PHRA.

Plaintiff claims that in terminating her, Defendant unlawfully discriminated against her on the basis of race and gender under Title VII and the PHRA.  Under Title VII and the PHRA, it is unlawful for an employer "to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race [or] . . . sex."  42 U.S.C. § 2002e2(a)(1); 43 Pa. Cons. Stat. § 951 et seq.[3]

In the absence of any direct evidence of unlawful discrimination by Defendant, each of these claims is to be evaluated under the burden-shifting framework that the Supreme Court set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under the traditional McDonnell Douglas framework, a plaintiff must first make a prima facie case of race or gender discrimination under Title VII by showing (1) he or she "is a member of a protected class," (2) that he or she is "qualified for the job from which she was discharged," and (3) "that others, not in the protected class, were treated more favorably."  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citing McDonnell Douglas, 411 U.S. at 802–03).

---

[3] PHRA claims are to be analyzed under the same standards as claims brought under Title VII. Grande v. State Farm Mut. Auto Ins. Co., 83 F. Supp. 2d 559, 562 (E.D. Pa. 2000).

When a plaintiff bringing a race discrimination claim under Title VII is not a member of a racial minority protected under Title VII, and is instead bringing a "reverse discrimination" claim, the prima facie framework is modified such that plaintiff must show (1) "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII," Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1990), and (2) that he or she has suffered an adverse employment action. Id. at 165.

If the plaintiff makes a prima facie showing of race or gender discrimination under Title VII, "the burden shifts to the [defendant] to set forth a legitimate non-discriminatory reason for the discharge." Hugh, 418 F.3d at 267 (citing McDonnell Douglas, 411 U.S. at 805–06). Once the defendant employer has articulated a "legitimate, nondiscriminatory reason," the burden shifts back to the plaintiff to show that "the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." Id. To make a showing of pretext sufficient to survive summary judgment in an employment discrimination case, a plaintiff must provide evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). "[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. at 765 (internal citations omitted).

10

Plaintiff may also bring a Title VII claim for "mixed motive" discrimination in which "an unlawful employment practice is established when the complaining party demonstrates that race, [or] . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).  In a "mixed motive" discrimination case, the plaintiff must first show that a Title VII protected trait was a "substantial factor" in the defendant's employment decision.  Fateke v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 265–66 (1989)).  A plaintiff may satisfy the "substantial factor" burden with "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race [or] . . . sex . . . was a motivating factor for any employment practice."  Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003).  When the plaintiff has made a showing that a Title VII protected trait was a "substantial factor" in defendant's decision, the burden shifts to the defendant to show "that it would have taken the same action in the absence of the impermissible motivating factor."  Makky, 541 F.3d at 213 (quoting Desert Palace, 539 U.S. at 95).

The Court will address Plaintiff's race and gender discrimination claims separately.

A.      **Plaintiff's Race Discrimination Claims**

Plaintiff argues that her claims of race discrimination under Title VII and the PHRA should be analyzed under "mixed motive" analysis, while Defendant argues for analysis under the traditional McDonnell Douglas analysis for claims of employment discrimination.  To be entitled to "mixed motive" analysis, Plaintiff must first show that there is "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor for any employment practice."  Desert Palace, 539 U.S. at 101.  Plaintiff argues that she can make such a showing because of statements by Defendant and its officials

espousing the benefits and necessity of increasing the racial diversity of its workforce.  Without

more than this generalized aspiration to foster racial diversity, however, no reasonable jury could

conclude that race was a motivating factor in any of Defendant's specific decisions about

Plaintiff's particular employment.

Plaintiff points to three adverse employment actions in her Complaint: 1) the decision to

hire Robert Stringer as executive director instead of her; 2) the decision to "demot[e] [her] upon

returning from leave"; and 3) her termination.  (Compl. ¶ 25.)  As to the decision to name

Stringer as executive director instead of Plaintiff, no reasonable factfinder could conclude that

race was a motivating factor for numerous reasons—not least of which is the fact that Stringer

and Plaintiff are both Caucasian.  (Def.'s Resps. to Pl.'s Interrogs.)  Similarly, without making

any finding as to whether Plaintiff was actually demoted following her return from leave,

Plaintiff's claim of race discrimination as to her transition from a salaried to an hourly employee

and the reassignment of some of her duties as clinical supervisor to Jonathan Marino is also

deficient.  Not only are Marino and Plaintiff both Caucasian (id.), but Defendant has also shown

that Plaintiff's transition from earning a salary to earning an hourly wage was a decision that

applied equally to all of its employees who ranked below the executive director.  (Plaintiff Dep.

132:22–135:6; Stringer Dep. 83:19–84:3.)  The record shows that the decision affected the vast

majority of Defendant's employees and did not disproportionately affect one race more than

another.  (Id.; Organizational Chart; Defs.' Resps. to Pl.'s Interrogs.)  In light of these

undisputed facts, no reasonable jury could conclude that race was a motivating factor in any

decision to "demot[e] Plaintiff upon returning from leave."

Turning to Defendant's decision to terminate Plaintiff's employment, Plaintiff relies

solely on various statements by Besden and Stringer, and Defendant's representations about its

commitment to increase diversity to better reflect and meet the needs of the surrounding community in its various CBH proposals as evidence of race discrimination.  "[A]n employer has every right to be concerned with the diversity of its workforce, and the work environment." Iadimarco, 190 F.3d at 164.  Generalized initiatives to increase the racial diversity of a workplace, including the keeping of racial demographic statistics, meant to "enable [an organization] to effectively service an increasingly diverse customer base" are lawful "to say nothing of the laudable goal of expanding the horizons of opportunity for more and more members of this great pluralistic society."  Reed v. Agilent Techs., Inc., 174 F. Supp. 2d 176, 186–87 (D. Del. 2001).  Unless a plaintiff can demonstrate that a defendant's "approach to diversity had some negative impact upon his individual employment situation, the mere existence of a policy promoting diversity awareness is not evidence of discrimination" under Title VII.  Id. at 185 (emphasis in original).

Here, Plaintiff has produced no evidence to show that Defendant's decision to terminate her was in any way motivated by the fact that she was Caucasian.  Instead, Plaintiff can point only to Besden and Stringer's testimony about the importance of diversity to its goals as an organization generally and to Defendant's statements in its CBH proposals that 1) it had "strive[d] to meet the needs of our primary target population (largely African-American) at all points of service" (Def.'s CBH Proposal of 2008), 2) that "it is the intention of [Defendant] . . . to hire and staff the [Medication Assisted Treatment Program] with representatives of the cultural mix that can be found in the SW area of Phila[delphia]" (Id.), 3) that it "intend[ed] to work with M[inority]/W[omen]/D[isabled] Business Enterprises with the goal of reaching 25% of the dollars subcontracted to for-profit M/W/DSBE subcontractors within 12 months of contract award,"  (Def.'s CBH Proposal of 2010), 4) that it had  "become aware of broader needs

within the surrounding communities," and (5) that "[i]n addition to a large Italian population, [Defendant] also provides recovery oriented outpatient treatment and support services to a growing Black, Latino, and LGBT community." (Def.'s CBH Proposal of 2012.) This evidence is analogous to that of the plaintiff in Iadimarco, who offered an internal company memorandum about the need to increase diversity among its employees. Iadimarco, 190 F.3d at 164–65. Presented with this evidence, the United States Court of Appeals for the Third Circuit upheld the District Court's grant of summary judgment to the employer, finding that "the memo is not, in and of itself, sufficient to establish a prima facie case of illegal discrimination" and that, even drawing all inferences in the light most favorable to the plaintiff, such proof was insufficient to make a prima facie showing of race discrimination. Id.

Plaintiff's proof of alleged race discrimination is further undermined when viewed in the broader context of all the hiring and firing Defendant did in 2011. That year, Defendant hired eighteen new counselors and supervisors, ten of whom were Caucasian, and eight of whom were not Caucasian. (Def.'s Resps. to Pl.'s Interrogs.) Of the seven employees that Defendant terminated in 2011, five were Caucasian, including Plaintiff, and two were not Caucasian, and resulting in a net gain of five employees who were Caucasian and six employees who were not Caucasian. (Id.) This margin of one more individual cannot be said to be evidence that Defendant discriminated against Plaintiff on the basis of her race. In light of these facts, the Court must find that Plaintiff has failed to present "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor for any employment practice." Desert Palace, 539 U.S. at 101. For the same reasons, this Court also cannot find that Plaintiff has shown "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is

14

protected under Title VII." <u>Iadimarco</u>, 190 F.3d at 161 (3d Cir. 1990).  Accordingly, the Court

will grant summary judgment to Defendant as to Plaintiff's claims of race discrimination under

Title VII and the PHRA.

      **B.**      **Plaintiff's Gender Discrimination Claims**

      Plaintiff also brings claims of gender discrimination under Title VII and the PHRA.  As

with race discrimination claims, in the absence of any direct evidence of gender discrimination

by a defendant, the Court traditionally analyzes gender discrimination claims under the

<u>McDonnell Douglas</u> burden-shifting framework.  In order to survive a motion for summary

judgment, a plaintiff claiming gender discrimination must first establish a prima facie case "(1)

that she is a member of a protected class, (2) she was qualified for the position, (3) she was

discharged, and (4) the position was ultimately filled by a person not of the protected class," or

that "another, not in the protected class, was treated more favorably." <u>Sheridan v. E.I. DuPont</u>

<u>de Nemours and Co.</u>, 100 F.3d 1061, 1066 n.5 (3d Cir. 1996); <u>Scheidemantle v. Slippery Rock</u>

<u>Univ. State Sys. of Higher Educ.</u>, 470 F.3d 535, 539 (3d Cir. 2006) (citations omitted).  "If [the

plaintiff] succeeds in making out a prima facie case, the burden shifts to the [defendant] to

establish a legitimate nondiscriminatory reason" for its decision.  <u>Scheidemantle</u>, 470 F.3d at

539 (citing <u>McDonnell Douglas</u>, 411 U.S. at 805–06).  Once the defendant employer has

articulated a "legitimate, nondiscriminatory reason," the burden shifts back to the plaintiff to

show that "the proffered reason is merely a pretext for actual discrimination." <u>Id.</u>

      As with her race discrimination claims, Plaintiff argues for a "mixed motive" analysis of

her gender discrimination claims.  As discussed above, in a "mixed motive" discrimination case,

the plaintiff must first show that a Title VII protected trait was a "substantial factor" in the

defendant's employment decision.  <u>Fateke</u>, 308 F.3d at 338 (citing <u>Price Waterhouse</u>, 490 U.S. at

15

265–66).  A plaintiff may satisfy the "substantial factor" burden with "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that . . . sex . . . was a motivating factor for any employment practice."  Desert Palace, 539 U.S. at 101.  Upon a showing that gender discrimination was a "substantial factor," the burden shifts to the defendant to show "that it would have taken the same action in the absence of the impermissible motivating factor."  Makky, 541 F.3d at 213 (quoting Desert Palace, 539 U.S. at 95).

Plaintiff argues that she can show gender discrimination was a "substantial factor" in 1) the decision to hire Robert Stringer as executive director instead of Plaintiff; 2) the decision to "demot[e] Plaintiff upon returning from leave"; and 3) terminating Plaintiff.  Compl. ¶ 25.  The Court will examine Plaintiff's evidence of gender discrimination as to each of these decisions individually.

As to Plaintiff's termination, Plaintiff cannot make a showing under "mixed motive" analysis that gender discrimination was a "substantial factor" in Defendant's decision, nor can she demonstrate under McDonnell Douglas analysis that "the position was ultimately filled by a person not of the protected class," or that "another, not in the protected class, was treated more favorably" because it is undisputed that, upon her termination, Plaintiff's duties as clinical supervisor were reassigned to another woman—Mary Douglas Bailey.  (Def.'s Resps. to Pl.'s Interrogs.; Stringer Dep. 127:15–128:6.)  Accordingly, since Bailey is of the same protected class as Plaintiff, and because Plaintiff offers no evidence to demonstrate that gender discrimination was a "substantial factor," or that others "not in the protected class, [were] treated more favorably," with regard to Defendant's decision to terminate her, the Court will grant summary judgment to Defendant on Plaintiff's claim of gender discrimination as to her termination.

16

There is, however, a dispute of material fact as to whether gender discrimination played a "substantial factor" or whether "another, not in the protected class, was treated more favorably" as to Defendant's decision to permanently reassign many of Plaintiff's clinical supervisor duties to a man, Jonathan Marino, upon Plaintiff's return from adoption leave. Specifically, Plaintiff has testified that executive director Stringer told her that while she "could take the minutes of the meeting[s] because [she] got good at it[,]" he had decided to keep Marino as the primary clinical supervisor "because he's a man." (Plaintiff Dep. 102:19–103:20.) Plaintiff does not offer any corroborating proof that this conversation took place. Such testimony, however, is specific and direct enough to enable a reasonable factfinder to find that gender discrimination was a "substantial factor," or otherwise support a finding that Defendant's stated legitimate, nondiscriminatory reasons were a pretext for gender discrimination when Defendant passed over Plaintiff for the executive director position or when Plaintiff reassigned her supervisory duties. While this is the only evidence that Plaintiff has offered to specifically show that gender discrimination motivated any adverse employment action, it is not for this Court, on a motion for summary judgment, to resolve issues of fact. Accordingly, the Court will deny summary judgment to Defendant on Plaintiff's claims of gender discrimination as to the decision to hire Robert Stringer as executive director instead of Plaintiff, and the decision to reassign Plaintiff's supervisory duties upon her return from adoption leave.

## IV. PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S OBJECTIONS TO DISCOVERY

Also pending is Plaintiff's Motion to Strike Defendant's Objections to Discovery. Specifically, Plaintiff seeks to strike twenty-two of Defendant's objections, including twenty-one responses to Plaintiff's interrogatories. In each instance, either Plaintiff's requests for

production were overly broad, or Defendant has otherwise made a good faith effort to comply with Plaintiff's request.  Accordingly the Court will deny Plaintiff's Motion to Strike Defendant's Objections to Discovery.

## V.    CONCLUSION

For all of the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's race discrimination claims and Plaintiff's gender discrimination claim as to her termination, but deny the Motion as to Plaintiff's remaining gender discrimination claims. The Court will also deny Plaintiff's Motion to Strike Defendant's Objections to Discovery.

An appropriate order follows.